## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Robert Gacho, (N44112),      )
                                  )
                 Petitioner,    )
                                  )      Case No. 17 C 0257
           v.                  )
                                  )      Judge Robert W. Gettleman
                                  )
Frank Lawrence, Acting Warden,   )
Menard Correctional Center,      )
                                  )
               Respondent.   )

## MEMORANDUM OPINION AND ORDER

Petitioner Robert Gacho, a prisoner incarcerated at the Menard Correctional Center, brings this *pro se* habeas corpus action pursuant to 28 U.S.C. § 2254 challenging his 1984 double murder, aggravated kidnapping, and armed robbery convictions from the Circuit Court of Cook County.[1] Petitioner claims that disgraced Judge Thomas Maloney, who presided over his case, took a bribe from Petitioner's codefendant.   In exchange, Maloney allegedly agreed to acquit the codefendant at a bench trial, and as part of the cover up, promised to insure that Petitioner was convicted at his jury trial.   Petitioner raises 18 claims --- some as to the alleged bribery, others on unrelated matters.   For the reasons set forth below, the Court denies the petition on the merits.   The Court grants a certificate of appealability as to the judicial bias claim, but declines to issue a certificate of appealability on all other claims.

---

1 The Court set a briefing schedule, (Dkt. 15.) allowing Respondent to file a response, (which he did) (Dkt. 17.) and Petitioner to file a reply (which he did not).

## I.    Background

This is Petitioner's fourth habeas corpus petition in the Northern District of Illinois.   The first three were dismissed for failure to exhaust available state court remedies.   *Gacho v. Butler*, 792 F.3d 732 (7th Cir. 2015).   Those prior petitions do not count towards the prohibition on second and successive petitions, 28 U.S.C. § 2244(b).   *Slack v. McDaniel*, 529 U.S. 473, 486 (2000); *Altman v. Benik*, 337 F.3d 764, 766 (7th Cir. 2003) (per curiam).   This is Petitioner's "first" petition for purposes of 28 U.S.C. § 2244(b).

The Court draws the following factual history from the state court record.   (Dkt. 22-24.) State court factual findings are presumed correct, and Petitioner has the burden of rebutting the presumption by clear and convincing evidence.   *Brumfield v. Cain*, 135 S. Ct. 2269, 2282 n.8 (2015) (citing 28 U.S.C. § 2254(e)(1)).   Petitioner has not made such a showing.

On December 12, 1982, at approximately 9:15 a.m., a forest preserve officer came across a parked car by the Des Plaines River in Lamont, Illinois.   *Illinois v. Gacho*, 522 N.E.2d 1146, 1150 (Ill. 1988) ("*Direct Appeal*").   Hearing pounding from inside the trunk the officer called the local police and fire departments.   *Id*.   The first responders opened the trunk, revealing two men inside.   *Id*.   The men, Tullio Infelise, and his uncle, Aldo Fratto, were bloodied with their hands tied behind their backs.   *Id*.   Infelise was still alive, while Fratto was dead.   *Id*.   Both suffered multiple gunshot wounds.   *Id*. at 1156.   Infelise was inside the trunk for six and half hours before his rescue.   *Id*. at 1155.

The officer immediately asked Infelise who did this to him.   *Id*. at 1151.   Infelise responded, "Robert Gott or Gotch."   *Id*.   The officer had a difficult time understanding the

response because Infelise was in pain and having trouble breathing. *Id*. In response to the question of where the police could find the assailant, Infelise responded "Florida." *Id*.

Approximately fifteen minutes after Infelise was freed from the trunk, he identified "Robert Gacho" as the assailant to the police. *Id*. at 1152. Infelise told the police that "Dino," and "Joe" were also assailants. *Id*. Dino Titone and Joseph Sorrentino would later be charged along with Petitioner. Infelise died from his injuries 16 days later. *Id*. at 1156-57.

The police notified Infelise's wife a few hours after he was discovered in the trunk. *Id*. at 1152. Infelise's brother, Frank, told the police that Petitioner worked with a third Infelise brother, Rosario. *Id*. Frank Infelise said he believed that Tullio Infelise and Fratto had gone to Gacho's house the night before, but he was not certain of this. *Id*.

The police arrested Petitioner at his home that same afternoon. *Id*. at 1152. Petitioner confessed to the police later that evening, and a transcribed confession was taken by a Cook County Assistant State's Attorney. *Id*. at 1151. Petitioner brought a pretrial motion to suppress the statement, and repudiated the confession at trial, alleging that he was physically and mentally coerced by the police. *Id*. Maloney rejected Petitioner's motion to suppress, and Petitioner's confession was introduced at trial. *Id*. at 1152-54.

Petitioner's confession stated that he, along with codefendants Sorrentino and Titone, met victims Infelise and Fratto at Petitioner's home late in the evening of December 11, 1982. *Id*. at 1151. The victims brought three quarters of a kilogram of cocaine to sell to Petitioner, Titone, and Sorrentino. *Id*. However, the assailants robbed the victims of their money and drugs. *Id*.

The victims were driven to Lamont where they were shot. *Id*. Petitioner did not shoot the victims, instead waiting in a second car. *Id*. He heard a total of eight shots. *Id*. The

assailants took cocaine, as well as somewhere between $1,500 to $2,000 from the victims. *Id*. Petitioner received $500 and half of the cocaine. *Id*. Petitioner told Sorrentino to take his share of the cocaine, so it was not stored in Petitioner's home. *Id*. The police recovered cocaine from Sorrentino's girlfriend's home. (Dkt. 23-9, pg. 7-9.)

Petitioner's girlfriend, Katherine De Wulf, testified on behalf of the prosecution at trial. *Direct Appeal*, 522 N.E.2d at 1150. (Petitioner was married with a wife and two young children while romantically involved with De Wulf.) De Wulf explained that Petitioner called her sometime between 10:30 and 11:00 p.m. on the evening of December 11, 1982, instructing her to drive to his house because he needed a "back-up car." *Id*. He told her he would call her later that evening when she needed to arrive. *Id*. Petitioner summoned De Wulf to his home at 1:45 a.m. on December 12th. *Id*.

De Wulf parked in the alley behind Petitioner's home. *Id*. She witnessed Sorrentino walk out of the home with the two victims. *Id*. She recognized the victims because she had previously seen them at Petitioner's body shop. *Id*. The victims' hands were tied behind their backs as they walked to a blue car. *Id*. Sorrentino sat in the blue car's driver's seat, while Titone was in the front passenger's seat. *Id*. The victims were in the backseat of this car. *Id*. Petitioner exited his home and sat in the front passenger seat of De Wulf's car. *Id*. He gave her a gun to put in her purse, but she was unable because the gun was too large. *Id*. Petitioner told De Wulf that they were taking the victims somewhere to "waste 'em." *Id*.

The two cars departed from Petitioner's home with the blue car in the lead followed by De Wulf's car. *Id*. After a few blocks, Petitioner told De Wulf he wanted to drive, and they switched positions. *Id*. The caravan traveled approximately 30 minutes to the area in Lamont where the

victims were later discovered shot in the trunk. *Id.* Once at the forest preserve, Petitioner and De Wulf stopped while the first car travelled down a gravel or dirt road. *Id.* De Wulf heard "several" gunshots. *Id.* Titone and Sorrentino came walking up the road to De Wulf's car. *Id.* They reported that they shot the victims, who were dead. *Id.* They said the victims begged for their lives, but, Titone and Sorrentino "just laughed" at their pleas. *Id.* De Wulf and the three assailants drove back to Petitioner's home discussing the robbed cocaine on the way. *Id.*

Petitioner was found guilty by a jury, and sentenced to death. *Id.* at 1149. The Supreme Court of Illinois affirmed the convictions on direct appeal, but vacated the death penalty sentence and remanded for resentencing. *Id.* at 1166. Petitioner was resentenced to life imprisonment. *Illinois v. Gacho*, 967 N.E.2d 994, 996 (Ill. App. Ct. 2012) ("*Post Conviction Appeal I*"). He then filed a postconviction petition. *Id.* The state trial court initially dismissed the petition, but the appellate court remanded for an evidentiary hearing. *Id.* The trial court denied the petition following the evidentiary hearing, and the appellate court affirmed. *Illinois v. Gacho*, 53 N.E.3d 1054, 1054 (Ill. App. Ct. 2016) ("*Post Conviction Appeal II*"). The state postconviction petition proceedings concluded with the denial of the petition for leave to appeal (PLA) by the Supreme Court of Illinois. *Illinois v. Gacho*, No. 120808, 60 N.E.3d 877 (Ill. Sept. 28, 2016) (Table). Petitioner now brings the instant habeas corpus petition before this Court.

## II.    Analysis

Petitioner raises the following claims in the habeas corpus petition:

A.    Inordinate delay by the state courts in resolving Petitioner's postconviction petition.

B.    Maloney's participation in the case denied Petitioner a fair and impartial trial.

C.    Ineffective assistance of trial counsel when Petitioner's counsel attempted to bribe Maloney.

5

D.      Ineffective assistance of trial counsel when counsel was suffering from an actual conflict.

E.      Ineffective assistance of trial counsel for various errors made by counsel during trial.

F.      A Fourth Amendment violation when the officers wrongfully arrested Petitioner at his home.

G.      The police wrongfully interrogated Petitioner after he invoked his right to counsel.

H.      Maloney wrongfully excused a juror from the case.

I.      The prosecution wrongfully introduced impermissible out-of-court statements.

J.      The prosecution wrongfully brought up the improper out-of-court statements during closing arguments.

K.      There is insufficient evidence to support the conviction.

L.      The prosecution examined Petitioner on improper topics.

M.      A prior consistent statement was wrongfully introduced into evidence at trial.

N.      The prosecutors wrongfully cross-examined Petitioner's wife on improper topics.

O.      Petitioner's wife's gun was wrongfully introduced into evidence at trial.

P.      Improper hearsay evidence was introduced at trial.

Q.      The prosecution's closing argument improperly minimized the burden of proof.

R.      Ineffective assistance of appellate counsel.

**A.      Claim A**

Petitioner asserts inordinate delay in the adjudication of his state postconviction petition.

It took the state courts 25 years to complete Petitioner's postconviction proceedings.  *See Post Conviction Appeal II*, 53 N.E.3d at 1057 (stating that Petitioner's initial postconviction petition

was filed in the state court on February 15, 1991); *Gacho*, No. 120808, 60 N.E.3d at 877 (Table) (denial of PLA on September 28, 2016, completing postconviction process).

The Court previously addressed the inordinate delay arguments in a previously habeas corpus petition. *Gacho v. Harrington*, No. 13 C 4334, 2013 WL 5993458, at *1 (N.D. Ill. Nov. 7, 2013). In 2001, this Court denied Petitioner's inordinate delay argument, holding that many of the delays in the state court were attributable to Petitioner. *Id*. In 2007, Petitioner renewed his inordinate delay argument. The Court expressed "serious concerns" about the delay, but the argument was voluntarily withdrawn via an agreement of the parties. *Id*. In 2013, the Court held that there was no inordinate delay because the state court was actively adjudicating Petitioner's claims at that time. *Id*. at *2. Petitioner appealed the Court's inordinate delay ruling, but the Seventh Circuit dismissed the appeal for want of appellate jurisdiction. *Gacho*, 792 F.3d at 737.

The state court completed the adjudication of Petitioner's postconviction proceedings prior to the filing of the present habeas corpus petition. *Gacho*, No. 120808, 60 N.E.3d at 877 (Table). Petitioner's present argument is not that inordinate delay should excuse completing the state court proceedings, but instead the 25 years it took the state courts to resolve his postconviction petition prejudiced him through the death of witnesses who supported his claims.

Although inordinate delay can excuse the exhaustion requirement, it is not a free-standing ground for habeas corpus relief. *Jackson v. Duckworth*, 112 F.3d 878, 880-81 (7th Cir. 1997). There is no constitutional right to bring a state postconviction petition, "let alone [a] prompt" one. *Montgomery v. Meloy*, 90 F.3d 1200, 1206 (7th Cir. 1996) (citing *Pennsylvania v. Finley*, 481 U.S. 557 (1987)). A prisoner must point to a separate federal constitutional right violated in his postconviction proceedings to raise a claim, and a delay in a postconviction proceeding does not

violate federal due process. *Jackson*, 112 F.3d at 881. Consequently, Petitioner invokes no freestanding constitutional ground.

Moreover, even if Petitioner could identify a freestanding constitutional claim, his argument that he was prejudiced is refuted by the record. It is true that three witnesses were deceased by the time the state trial court conducted an evidentiary hearing on his postconviction claims in 2013, but the state court allowed the introduction of previously obtained affidavits from these witnesses. *Post Conviction Appeal II*, 53 N.E.3d at 1058. There is no indication that Petitioner was prejudiced by the length of his postconviction proceedings. Claim A is denied.

### B.    Claim B

#### 1.    Petitioner's Allegations

Claim two is the Maloney judicial bias claim. Maloney, who presided over Petitioner's trial, served as a Cook County Circuit Court judge from 1977, until his retirement in 1990. *United States v. Maloney*, 71 F.3d 645, 649 (7th Cir. 1995). "Maloney was one of the many dishonest judges exposed and convicted through Operation Greylord, a labyrinthine federal investigation of judicial corruption" in the Circuit Court of Cook County. *Bracy v. Gramley*, 520 U.S. 899, 901 (1997). He was indicted in 1991, and a federal jury convicted him in 1993 of racketeering conspiracy, racketeering, extortion under the color of official right, and obstruction of justice in connection with taking bribes to fix four separate cases --- an attempted murder case, a deceptive practices case, and two murder cases.[2] *Bracy*, 520 U.S. at 901; *Maloney*, 71 F.3d at 649. Maloney took bribes through the use of a bagman --- first his bailiff, Lucius Robinson, and later a

---

2 Petitioner's case is not one of the four in Maloney's federal prosecution.

lawyer, Robert McGee, with whom Maloney previously practiced before becoming a judge. *Maloney*, 71 F.3d at 650.

Maloney was a defense attorney prior to becoming a judge. *Bracy*, 520 U.S. at 901. He had close ties to organized crime, who often paid off judges in criminal cases. *Id*. at 901-02. Maloney utilized these corrupt relationships to solicit bribes for himself once he became a judge. *Id*. Maloney developed a reputation as a strict prosecution oriented judge. *Bracy v. Schomig*, 286 F.3d 406, 413 (7th Cir. 2002) (en banc). He adopted the tough persona intentionally to deflect suspicion from his criminal activities, and to encourage defendants before him to pay him bribes. *Id*. Maloney died in 2008. *United States ex rel. Wadley v. Hulick*, No. 06 C 258, 2008 WL 4724429, at *7 n.2 (N.D. Ill. Oct. 24, 2008).

Petitioner alleges two bribery schemes involving Maloney in his case. He also mentions Maloney's organized crime connections.

In the first bribery scheme, codefendant Dino Titone's father alleged that he agreed to pay a bribe to Maloney on his son's behalf. (Dkt. 23-14, pg. 69.) The scheme, facilitated through Dino Titone's attorney, Bruce Roth, had Titone's father pay Maloney $10,000. *Post Conviction Appeal II*, 53 N.E.3d at 1057. Titone's father neither spoke directly to Maloney nor gave him the money; instead Roth presented the bribery scheme to Titone's father, and allegedly acted as the go between. *Id*. According to Titone's father, Roth said he would give the $10,000 to Maloney's bagman (McGee), who then would pass the money onto Maloney. (Dkt. 23-14, pg. 69.)

McGee was convicted in Greylord. *United States v. McGee*, No. 97 C 3129, 1997 WL 757411 (N.D. Ill. Nov. 21, 1997). So too was Roth. *United States v. Roth*, 860 F.2d 1382, 1383

(7th Cir. 1988). Roth's Greylord case showed he was a broker who matched willing lawyers and judges open to bribery. *Id*.

Petitioner and Titone's trials before Maloney were severed, but conducted simultaneously with Petitioner proceeding before a jury, and Titone taking a bench trial. *Post Conviction Appeal II*, 53 N.E.3d at 1057. According to the father's affidavit, Maloney agreed to acquit Titone, and promised to insure Petitioner and Sorrentino were convicted as cover. *Id*.

Titone's father explained that Maloney had an upcoming judicial retention election a year later in 1984. (Dkt. 23-14, pg. 70.) The father understood that convicting Petitioner and Sorrentino would give Maloney sufficient cover for the election allowing him to acquit Titone. *Id*.

Titone's father's affidavit also alleged that Roth and Maloney discussed the then ongoing Greylord investigation. *Id*. According to Titone's father, Roth allegedly assured Maloney that he would not cooperate with investigators. *Id*.

The purported deal apparently fell through as Maloney found Titone guilty and sentenced him to death. *Id*. Titone's father's affidavit presents a number of possible theories as to what happened (including that Roth stiffed Maloney, or Roth and/or Maloney got cold feet in light of the upcoming election and/or Greylord investigation). (Dkt. 23-14, pg. 70-71.) The affidavit is clear that Titone's father does not know what happened to the bribery agreement, only that Titone was not acquitted as promised by Roth (purportedly on Maloney's behalf).

An affidavit from Roth is also in the record. (Dkt. 23-20, pg. 41.) Given in 1988, while in federal custody for his Greylord case, Roth explains that he was unwilling to give an affidavit regarding the Titone case until his own federal prosecution was complete. *Id*. He did speak to

Titone's postconviction attorney, Ian Ayers, who provided his own affidavit detailing his discussions with Roth while Roth was in federal custody. Ayers's affidavit memorializing his conversations with Roth makes no mention of Petitioner. (Dkt. 23-20, pg. 43-47.)

The second alleged scheme involved a bribe of Maloney suggested by Petitioner's initial attorney, Daniel Radakovich. *Post Conviction Appeal II*, 53 N.E.3d at 1058. Petitioner alleges that Radakovich, who had been hired by one of Petitioner's friends to represent Petitioner, told Petitioner that Maloney would acquit him if he paid a bribe of $60,000, or the equivalent in cocaine. *Id*. Although interested, Petitioner and his family could not raise the necessary money or drugs. *Id*. Radakovich allegedly became disinterested in Petitioner's case once it became clear that Petitioner could not come up with the bribe money. *Id*. Petitioner again spoke to his friend about a new lawyer, and soon after his aunt hired Robert McDonnell. *Id*.

Petitioner's mother provided an affidavit attesting that Radakovich told her that Maloney could be bought for $60,000. *Id*. at 1057. She responded that she could not raise that amount of money. *Id*. Petitioner's aunt also provided an affidavit attesting that Petitioner told her that the judge could be bribed. *Id*.

Petitioner's final argument regarding Maloney's alleged bias is that one of the victims, Tullio Infelise, was a member of organized crime. He also points out that Maloney had known connections to organized crime. *Bracy*, 520 U.S. at 901-02. Petitioner does not explain the relevance of the organized crime allegation, instead adding it to the case's milieu as an "additional fact of import which applies to Judge Maloney's bias in the case. . . ." (Dkt. 1, pg. 22.)

It is true that organized crime is in the ether of this case. Beyond Maloney, Petitioner's second attorney, McDonnell, who replaced Radakovich, had his own underworld connections.

Considered an "outfit" lawyer, *Bracy*, 286 F.3d at 414, McDonnell was the son-in-law of Sam Giancana, longtime boss of the Chicago Outfit. *Gacho*, 792 F.3d at 734. McDonnell served a two-year federal sentence for conspiracy to distribute counterfeit money in 1966, and was convicted of income tax evasion in 1968. *Bracy*, 286 F.3d at 414. He was disbarred in 1972, but reinstated in 1980. *Id.* In 1989, he was convicted of conspiracy to defraud the government, and solicitation to influence the operation of an employee benefits plan. *Id.* He was sentenced to six years imprisonment, and withdrew his name from Illinois's roll of attorneys to avoid disbarment for a second time. *Id.* McDonnell died in 2006. Trevor Jensen, *Robert McDonnell: 1925-2006*, Chi. Trib., Nov. 7, 2006, at 4.

Beyond McDonnell and Maloney, Petitioner alleges that the Infelise family were members of organized crime, and codefendant Titone was related to noted mobster Frank Calabrese, Sr. (Dkt. 1, pg. 22.).

### 2.     The State Court's Review of Petitioner's Claim

An evidentiary hearing on Petitioner's postconviction petition was held before Cook County Circuit Court Judge Diane Cannon. (Dkt. 23-22, pg. 66-180; Dkt. 23-23, pg. 2-139.) Titone's father, and Petitioner's mother and aunt had all passed away by the time of the evidentiary hearing. *Post Conviction Appeal II*, 53 N.E.3d at 1059. Judge Cannon, however, allowed the introduction of their affidavits into evidence. *Id.* Petitioner testified on his own behalf at the hearing, reasserting his claim that Radakovich told him that Maloney could be bought, and he became disinterested in the case once Petitioner and his family could not raise the money. *Id.* at 1058.

Petitioner's other witness was Ronald Barrow. *Id.* Barrow, who is serving a life sentence for an unrelated murder, testified that he met Titone in May 1995, at the Cook County Jail while Barrow was waiting to testify on a different matter. *Id.* According to Barrow, Titone said, "he felt it was bad karma when the judge double crossed him on a deal he had made to slam Bob Gacho and convict him." *Id.* Titone, per Barrow, had said that his father paid the $10,000 bride to Malone. *Id.*

The state impeached Barrow with the jail's records showing that Barrow was not there after May 1995, while Titone was at the jail between October 1997, and October 1998. *Id.*

Radakovich testified on the state's behalf at the hearing. *Id.* He denied engaging in any type of misconduct and denied saying to Petitioner or anyone that Maloney could be bribed. *Id.* He further claimed to actively participate in Petitioner's case because he had filed pretrial answers to discovery, and prepared a motion to suppress on Petitioner's behalf. *Id.*

Judge Cannon denied Petitioner's judicial bias claim (Dkt. 22-5, pg. 46-48.), and the state appellate court affirmed. *Post Conviction Appeal II*, 53 N.E.3d at 1061-63. The state appellate court's decision is the subject of this Court's review because it was the last state court decision to address Petitioner's claim on the merits. *Harris v. Thompson*, 698 F.3d 609, 623 (7th Cir. 2012) (citing *Green v. Fisher*, 565 U.S. 34, 40 (2011); *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006)).

The state appellate court concluded that, "[t]here is no direct evidence in the record that Maloney solicited, received, or agreed to accept a bribe to influence his rulings in defendant's case." *Post Conviction Appeal II*, 53 N.E.3d at 1061. As to Titone, the appellate court recognized that the father's affidavit "consists nothing more than hearsay," of what Roth allegedly told the father. *Id.* at 1062.

Despite the fact that there was no evidence to support the Titone bribery allegation, the appellate court recognized that there were two decisions that "make a factual reference to Titone having given Maloney a $10,000 bribe to find him not guilty but that Maloney convicted him anyway and sentenced him to death." *Id.* at 1061 (citing *Bracy*, 286 F.3d at 412; *United States ex rel. Titone v. Sternes*, No. 02 C 2245, 2003 WL 21196249, at *1 (N.D. Ill. May 15, 2003) (Zagel, J.)).

In Titone's 28 U.S.C. § 2254 case, Judge Zagel's opinion found that Titone paid a $10,000 bribe to Maloney for an acquittal. *United States ex rel. Titone*, No. 02 C 2245, 2003 WL 21196429, at *1. Judge Zagel stated, "there was evidence that [Roth] paid Judge Maloney $10,000 to find [Titone] not guilty," but Maloney returned the money after he found out he was under investigation in *Greylord*. *Id.*

Maloney convicted Titone and sentenced him to death "presumably in an effort to protect himself from bribery and conspiracy charges." *Id.* This resulted in the state court granting Titone's postconviction petition and ordering a retrial. *Id.* Titone was convicted at retrial, and that new conviction was the subject of the habeas corpus petition before Judge Zagel, which he denied. *Id.*

The Seventh Circuit's *Bracy en banc* decision also discusses Titone's case. Titone was not before the Seventh Circuit in *Bracy*; instead his case was used as an example of Maloney engaging in compensatory bias. 286 F.3d at 412. The Seventh Circuit stated that Titone paid the $10,000, but Maloney convicted him anyway "to deflect suspicion from himself." *Id.* Notably, there is no mention of Petitioner in either the Seventh Circuit's *Bracy* opinion or Judge Zagel's ruling on Titone's habeas corpus petition.

In light of the statements in those cases, the state appellate court "assume[d], [] for the purposes of our analysis, that Titone did bribe Maloney, and that Maloney convicted Titone to deflect suspicion from himself." *Post Conviction Appeal II*, 53 N.E.3d at 1061. However, the appellate court held that even under that assumption, there was no evidence that Maloney also engaged in compensatory bias against Petitioner. *Id*. at 1063.

Equally, the state court found there was no evidence that Petitioner ever attempted to bribe Maloney. *Id*. at 1061. Judge Cannon credited Radakovich's testimony, finding him credible, and rejected Petitioner's testimony as incredible. *Id*. She further found that the affidavits from Petitioner's mother and aunt contained hearsay, and also were incredible. *Id*. The appellate court found no reason to reject Judge Cannon's credibility determinations. *Id*. Concluding that there was no evidence of either bias as the result of direct bribery or compensatory bias, the state appellate court affirmed the denial of Petitioner's judicial bias claim.

### 3.     Discovery in this Court

Petitioner did not seek discovery on his judicial bias claim in this Court. However, the Court briefly considers the discovery question *sua sponte* because the Supreme Court granted the prisoners in *Bracy v. Gramley* leave to conduct discovery on their judicial bias claims regarding Maloney. 520 U.S. 889 (1997). The Court concludes discovery is improper in this case due to the intervening passage of the Antiterrorism and Effective Death Penalty Act, (AEDPA), as well as the Supreme Court's decision in *Cullen v. Pinholster*, 563 U.S. 170, 185 (2011).

As mentioned, the prisoners in *Bracy* were given leave to conduct discovery as to their judicial bias claim. However, *Bracy* applied the pre-AEDPA standards from *Harris v. Nelson*, 394 U.S. 286 (1969), and Rule 6(a) of the Rules Governing Habeas Corpus Cases Under Section

2254. 520 U.S. at 904, 908-09. Although the AEDPA was enacted a year earlier, the Supreme Court understandably did not discuss the AEDPA in *Bracy* because it was a death penalty case, and Congress explicitly exempted pending death penalty cases from a retroactive application of the AEDPA. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). *Lindh* went onto hold that the AEDPA does not apply retroactively to non capital cases either. *Id.* at 323.

In fact, the Supreme Court in *Bracy* appears to recognize it is a pre-AEDPA case, without explicitly saying so, by citing to the pre-AEDPA law including the "law and justice requires" standard for adjudicating petitions. 520 U.S. at 904. *Bracy* is clearly a pre-AEDPA case.

In contrast, this is an AEDPA case because Petitioner filed the present habeas corpus petition after April 24, 1996. The difference between pre-AEDPA and AEDPA is dispositive on the discovery question.

The Supreme Court in *Cullen* made clear that under the AEDPA, the Court cannot consider evidence beyond what was before the state court when it adjudicated the merits when reviewing a claim under 28 U.S.C. § 2254(d)(1). 563 U.S. at 185. ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitations of § 2254(d)(1) on the record that was before that state court."). As this Court is considering Petitioner's claim under § 2254(d)(1), the Court cannot consider any evidence outside the state court record. *See Jordan v. Hepp*, 831 F.3d 837, 849 (7th Cir. 2016) (explaining that an evidentiary hearing is allowed under 28 U.S.C. § 2254(e)(2), only if petitioner satisfies § 2254(d)(1)); *Campbell v. Reardon*, 780 F.3d 752, 772 (7th Cir. 2015) (same); *Taylor v. Grounds*, 721 F.3d 809, 824 (7th Cir. 2013) (same); *Stitts v. Wilson*, 713 F.3d 887, 898 (7th Cir. 2013) (same).

The Court is aware of *Tabb v. Christianson*, which approved a district court's grant of discovery in a habeas corpus case. 855 F.3d 757, 764 (7th Cir. 2017). Despite being an AEDPA case, *Tabb* cites to *Bracy*, and applies the pre-AEDPA standard for permitting discovery in a habeas corpus case. *Id*. at 763. *Tabb* also cites to *Hubanks v. Franks*, 392 F.3d 933 (7th Cir. 2004), a case decided before *Cullen*, and *Hubanks* also cites to the pre-AEDPA standard from *Bracy*.

*Tabb* does cite *Cullen*, stating, "[a]s a general rule, federal habeas petitions must be decided on state court records." *Tabb*, 855 F.3d at 763 (citing *Cullen*, 563 U.S. at 182). However, *Tabb* does not consider *Cullen's* holding prohibiting a federal court from considering evidence outside of what was before the state court when performing the § 2254(d)(1) analysis, nor the Seventh Circuit's decisions in *Jordan*, *Campbell*, *Reardon*, and *Stitts* which all set forth the *Cullen* standard that a federal court cannot consider evidence beyond what was before the state court when performing the § 2254(d)(1) analysis. Thus, the Court proceeds to the merits review of the judicial bias claim under § 2254(d), limiting its review to what was before the state court as required by *Cullen*.

### 4.     The Court's Review of the Judicial Bias Claim

Petitioner's allegations involving a bribery scheme suggested by Radakovich are clearly without merit. The state court credited Radakovich's testimony denying the allegations, and there is nothing to rebut this factual finding. 28 U.S.C. § 2254(e)(1). Moreover, Petitioner concedes that there was no alleged bribery facilitated by Radakovich because Petitioner and his family could not come up with the bribe money. There is nothing in the record to suggest Maloney had a bias against Petitioner due to Radakovich's alleged actions.

As to Maloney's organized crime connections, Petitioner simply adds this to the context of the case. He does not allege any type of bias based on Maloney's organized crime associations, and there is nothing in the record to suggest a bias on that point. With these two issues out of the way, the Court turns to the central issue of the Titone bribery allegation.

The Court's review of this claim is governed by the AEDPA. The Court may not grant habeas relief unless the state court's decision on the merits was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or unless the state court decision is based on an unreasonable determination of facts. 28 U.S.C. § 2254(d). "The AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014); *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

"Due process guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 136 S. Ct. 1899, 1905 (2016) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)); *Bracy*, 520 U.S. at 905. The presence of a biased judge requires an automatic reversal of a conviction regardless of whether a case was tried before a jury, or the conviction was reviewed by unbiased judges on appeal. *Edwards v. Balisok*, 520 U.S. 641, 647 (1997); *Cartalino v. Washington*, 122 F.3d 8, 10 (7th Cir. 1997). A judge who accepts a bribe to "fix" a case is biased. *Bracy*, 520 U.S. at 905. Equally, a judge who engages in "compensatory bias" against other defendants who did not bribe him to deflect suspicion from his criminal activities or encourage them to pay him bribes is also biased. *Id.*; *Hopper v. Ryan*, 729 F.3d 782, 783 (7th Cir. 2013).

18

There is a presumption that public officials "'properly discharge their official duties.'" *Bracy*, 520 U.S. at 909; *Bracy*, 286 F.3d at 409 (quoting *United States v. Chemical Foundation, Inc.*, 272 U.S. 1, 15 (1926)). Maloney is not entitled to this presumption because he was shown to be "thoroughly steeped in corruption through his public trial and conviction." *Bracy*, 520 U.S. at 909; *see also Bracy*, 286 F.3d at 409.

The fact that "Maloney was so exceedingly corrupt does not support a *per se* finding that every case over which he presided was infected" by his corruption. *Bracy*, 286 F.3d at 409. Instead, Petitioner has the burden of demonstrating that Maloney was "'actually biased in Petitioner's own case.'" *Guest v. McCann*, 474 F.3d 926, 932 (7th Cir. 2007) (quoting *Bracy*, 520 U.S. at 909; *Bracy*, 286 F.3d at 410.) Petitioner may use either direct and/or circumstantial evidence to prove that Maloney was biased against him in his case. *Bracy*, 520 U.S. 905; *Bracy*, 286 F.3d at 411; *Franklin v. McCaughtry*, 398 F.3d 955, 960 (7th Cir. 2005).

Case law recognizes three fact patterns regarding judicial bias and bribery: (1) a judge who accepts bribes in other cases, with no evidence of a bribe in the defendant's case; (2) a judge who accepts a bribe to acquit a codefendant and agrees to convict the defendant as part of the coverup; and, (3) a judge who accepts a bribe to acquit a codefendant, with no evidence of an agreement to convict the defendant as part of the coverup.

### Fact Pattern One

*Bracy* involves the first fact pattern of a judge (Maloney) accepting bribes in other cases, with no evidence of a bribe in the prisoner's case. *Bracy*, 520 U.S. at 905; *Bracy*, 286 F.3d at 411; *Cartalino*, 122 F.3d at 10. In this situation, the petitioner can argue a "compensatory bias" claim --- the judge was biased because he had an incentive to cover up his misconduct in other

cases or encourage other defendants to bribe him --- but the burden is on the petitioner to show actual bias by the judge. *Bracy*, 520 U.S. at 905; *Bracy*, 286 F.3d at 411.

**Fact Pattern Two**

In the second fact pattern, the codefendant bribes the judge for an acquittal, the judge agrees to convict the codefendant as part of the coverup, and the judge follows through on the plan by acquitting the codefendant and convicting the petitioner. *Bracy*, 520 U.S. at 905; *Cartalino*, 122 F.3d at 10. The judge's bias against the defendant he agrees to convict requires automatic reversal. *Id*.

**Fact Pattern Three**

In the third fact pattern, the judge agrees to a bribe from a codefendant in the defendant's case and carries out the plan to acquit the codefendant, but there is no evidence that the judge agreed to convict the defendant as part of the consideration for the bribe. *Cartalino*, 122 F.3d at 10. Although the bribe paid by the codefendant to the judge is not "conclusive proof of judicial bias," "it is such strong evidence --- much stronger than the evidence in *Bracy* --- that [] it shifts the burden of persuasion to the state, to show that there was no actual bias." *Id*. at 11.

This case does not fall neatly into any of the three categories. Judge Cannon held there was no evidence of a bribe when rejecting Petitioner's postconviction petition. *Post Conviction Appeal II*, 53 N.E.3d at 1061. The state appellate court did not dispute Judge Cannon's finding, but for purposes of its review assumed there was a bribe, and that the deal broke down. *Id*. The appellate court assumed that Maloney convicted Titone, and sentenced him to death as part of Maloney's coverup of the failed bribery scheme. *Id*. Specifically, the state appellate court found:

In this case, there is no competent or credible evidence in the record supporting a finding that Maloney had a pecuniary interest in the outcome of the defendant's case, that the defendant bribed Maloney, that Maloney solicited a bribe from the defendant, or that the bribery scheme which existed between Maloney and the codefendant, Titone, included any requirement involving the outcome of the defendant's trial. Distilled to its finest, the record in this case establishes only that the defendant was tried simultaneously with a co-defendant who, as we have assumed for purposes of analysis, bribed a corrupt trial judge; thus giving rise to a claim of compensatory bias . . . .

*Post Conviction Appeal II*, 53 N.E.3d at 1063.

In other words, because the bribery agreement clearly broke down, the state appellate court applied the *Bracy* compensatory bias standard because the state court concluded that, without an active bribery agreement, all that remained was Maloney attempting to cover up his crimes, just like as *Bracy*.   The case, in sum, is in between fact patterns one and three, with the state appellate court concluding that the case was on fact pattern one's side of the line.   The Court concludes that it cannot find the state court ruling on this point was contrary to, or an unreasonable application of, clearly established law from the Supreme Court of the United States.

One might challenge the state court's analysis.   It is true that this case is different than *Bracy* in that the alleged bribe occurred in this case, while *Bracy* involved bribery in other Maloney cases, but not the case at issue in *Bracy*.   *Cartalino* (which sets forth fact patterns two and three) held that a bribe paid by the codefendant in the petitioner's case is significantly stronger evidence of judicial bias than a bribe paid in an unrelated case before the same judge.   122 F.3d at 10. *Cartalino* also found that a bribery scheme that requires a defendant's conviction as part of the coverup requires automatic reversal.   *Id*.   However, both *Bracy* and *Cartalino* do not address what happens when the bribery scheme falls apart.   Does the Court default to the traditional compensatory bias standard under *Bracy*, or does *Cartalino* apply when the scheme disintegrates?

A court deciding the question *de novo* might come to the conclusion that *Cartalino* should apply. However, the case is before this Court under the demanding AEDPA standard. The question is not what the Court would decide if answering the question in the first instance. Instead, it is whether the state appellate court's determination is contrary to, or an unreasonable determination, in light of Supreme Court precedent, or predicated upon an unreasonable determination of fact. 28 U.S.C. § 2254(d).

Because this Court is considering whether the state court identified the correct legal standard for Petitioner's claim, the question is under the "contrary to" standard. "'A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts.'" *Premo v. Moore*, 562 U.S. 115, 128 (2011) (quoting *Bell v. Cone*, 535 U.S. 685, 694 (2002)).

In considering this question, this Court recognizes that "[t]he AEDPA's standard is intentionally 'difficult for Petitioner to meet.'" *Woods*, 135 S. Ct. at 1376 (quoting *Woodall*, 572 U.S. at 415; *Metrish*, 569 U.S. at 358). "As a condition for obtaining habeas corpus [relief] from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 83, 103 (2011). This "'highly deferential standard [] demands that state-court decisions be given the benefit of the doubt.'" *Cullen*, 563 U.S. at 181 (quoting *Woodford*, 537 U.S. at 24).

In light of the deferential AEDPA standard, the Court cannot say the state appellate court's

decision to apply the compensatory bias standard is contrary to clearly established federal law. Although reasonable jurists might disagree with the state appellate court's decision, the state court's ruling is not a well-understood error. *Harrington*, 562 U.S. at 103.

Additionally, one has to question whether *Cartalino* can be applied at all under the AEDPA. *Cartalino* is a pre-AEDPA case, as the petition was filed on April 18, 1996. *Cartalino v. Washington*, No. 96 C 2269 (N.D. Ill.). The Seventh Circuit in *Cartalino*, although discussing multiple Supreme Court cases, does not explain whether its standard shifting the burden of proof in that case (the third fact pattern) was an application of clearly established federal law from the Supreme Court, or a new holding. The AEDPA limits this Court's review to the holdings of Supreme Court precedent. *Woods*, 135 S. Ct. at 1376. The Supreme Court has "repeatedly emphasized" that precedent from the United States Court of Appeals is not clearly established federal law from the Supreme Court under the AEDPA. *Glebe v. Frost*, 135 S. Ct. 429, 431 (2014) (per curiam); *Long v. Pfister*, 874 F.3d 544, 549 (7th Cir. 2017) (en banc) ("The Justices insist that a principle be made concretely applicable to the problem at hand before it may be used on collateral review."). Regardless, even if *Cartalino* can be applied, the state court's decision to apply *Bracy's* compensatory bias standard is not contrary to clearly established federal law under the deferential AEDPA standard.

Thus, the Court proceeds with a review of the state court's decision under the traditional *Bracy* compensatory bias standard to see if the state court's adjudication of the claim was an unreasonable determination under the AEDPA. The state court made a factual finding that there was no evidence of a bribe paid to Maloney by either Titone, Titone's father, or Petitioner. *Post Conviction Appeal II*, 53 N.E.3d at 1063. As noted above, this factual finding is presumed correct,

23

and Petitioner has the burden of rebutting the presumption by clear and convincing evidence. *Brumfield*, 135 S. Ct. at 2282; § 2254(e)(1).

As the state court properly recognized, Titone's father's affidavit only provides hearsay of what Roth allegedly told him. There is nothing in the record before the state court to demonstrate that there was an agreement between Titone and Maloney to fix the case, or that a bribe was ever paid. Titone's father concedes in his affidavit that he does not know what happened, only that he believed there was an agreement with Maloney (via Roth) for an acquittal, but his son was later convicted and sentenced to death. (Dkt. 23-14, pg. 70-71.)

To be clear, there was no competent evidence before the state court in Petitioner's postconviction proceeding record demonstrating that there was ever a deal between Maloney and Titone, and certainly nothing involving a deal implicating Petitioner. The state appellate court held there was no evidence that Titone bribed Maloney, but nevertheless considered the case as having a bribe in light of the *Bracy en banc* and Judge Zagel's opinions, which found that the bribery agreement broke down once Maloney discovered he was a target of Greylord, and Maloney convicted Titone and sentenced him to death to coverup the bribery.

Thus, the state court properly looked to Maloney's performance at Petitioner's trial to see if there was any indication of bias against Petitioner. A review of Maloney's rulings and actions during Petitioner's case is an acceptable method for determining whether Maloney harbored compensatory bias against Petitioner. *Guest*, 474 F.3d at 932; *Bracy*, 286 F.3d at 414; *Bracy*, 286 F.3d at 422 (Posner, J., concurring); *Wadley v. Gaetz*, 348 Fed. Appx. 148, 149-50 (7th Cir. Aug. 6, 2009).

The Court agrees with the state appellate court that there is no evidence in the record that

Maloney engaged in compensatory bias against Petitioner in an attempt to conceal the assumed bribe from Titone that Maloney subsequently returned. Judge Cannon reviewed the state court record in full. *Post Conviction Appeal II*, 53 N.E.3d at 1063. She "could not find one questionable ruling" by Maloney. *Id.* The state appellate court affirmed Judge Cannon's conclusion that there was no evidence to support a compensatory bias claim. Having reviewed the record in full, the Court concludes this is not an unreasonable determination under the AEDPA deferential standard. 28 U.S.C. § 2254(d). Petitioner fails to demonstrate that Maloney was actually biased against him in his case as required under *Bracy's* compensatory bias standard. As a result, the state court's rejection of Petitioner's judicial bias claim is not contrary to, nor an unreasonable application of, clearly established federal law, and is not predicated upon an unreasonable determination of fact. 28 U.S.C. § 2254(d). Consequently, the Court denies Petitioner's judicial bias claim (Claim B) in its entirety.

### C.  Claim C

Petitioner next argues that his pretrial attorney Radakovich was ineffective by suggesting that Petitioner bribe Maloney. This claim builds upon the allegations in Claim Two. As mentioned above, Petitioner alleges that Radakovich told him that an acquittal could be purchased from Maloney for a $60,000 bribe, or equal value of cocaine. Petitioner concedes that nothing came of the plan because he could not raise the necessary money. However, as explained above, there is no evidence in the record to support Petitioner's allegation that Radakovich suggested a bribe. Petitioner goes further in this claim alleging that Radakovich provided "Maloney with the expectation that he would be bribed." (Dkt. 1, pg. 24.) There is no evidence in the record to support Petitioner's allegation that Radakovich raised the possibility of a bribe to Maloney.

This claim was raised in Petitioner's amended postconviction petition before the state trial court.   (Dkt. 23-14, pg. 55-56.)   The claim, however, was not presented in Petitioner's postconviction appeal to the Appellate Court of Illinois, (Dkt. 24-4, Dkt. 24-7) or in his petition for leave to appeal (PLA) before the Supreme Court of Illinois.   (Dkt. 24-10.)

Respondent correctly asserts that the claim is procedurally defaulted.   "To obtain federal habeas review, a state prisoner must first submit his claim through one full round of state-court review."   *Johnson v. Hulett*, 574 F.3d 428, 431 (7th Cir. 2009) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971)); *see also* 28 U.S.C. § 2254(b)(1).   This includes presenting the claims in a PLA before the Supreme Court of Illinois.   *Guest*, 474 F.3d at 930 (7th Cir. 2007) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-46 (1999)).   Petitioner did not assert his claim in either his direct appeal or postconviction proceedings.   This results in procedural default.

Petitioner cannot excuse his defaults through either cause and prejudice, nor fundamental miscarriage of justice.   Regarding cause and prejudice, cause is an "'objective factor, external to Petitioner that impeded his efforts to raise the claim in an earlier proceeding.'" *Weddington v. Zatecky*, 721 F.3d 456, 465 (7th Cir. 2013) (quoting *Smith v. McKee*, 596 F.3d 374, 382 (7th Cir. 2010)).   Examples of cause include: (1) interference by officials making compliance impractical; (2) the factual or legal basis was not reasonably available to counsel; or, (3) ineffective assistance of counsel. *Guest*, 474 F.3d at 930 (citing *McCleskey v. Zant*, 499 U.S. 467 (1991)).   The first two types of cause are not applicable to this case.

Ineffective assistance of counsel also does not excuse the default.   An ineffective assistance of counsel argument asserted to excuse a default must, itself, be properly preserved in the state courts.   *Edwards v. Carpenter*, 529 U.S. 446, 453 (2000); *Smith v. Gaetz*, 565 F.3d 346,

352 (7th Cir. 2009). Petitioner has not exhausted any ineffective assistance of counsel argument to excuse the default of this claim.

Equally, Petitioner cannot argue that postconviction counsel's failure to preserve the claim on postconviction appeal excuses the default. The Supreme Court in *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), permitted ineffective assistance of postconviction trial counsel to excuse a defaulted ineffective assistance of trial counsel claim. That is not the case here, because the default is from the failure to raise the claim in a postconviction appeal. *Steward v. Gilmore*, 80 F.3d 1205, 1212 (7th Cir. 1996) (holding that ineffective assistance of postconviction appellate counsel does not constitute cause to excuse a default). Moreover, *Martinez* and *Trevino* are inapplicable to Illinois prisoners. *Crutchfield v. Dennison*, 910 F.3d 968, 978 (7th Cir. 2018). Cause and prejudice cannot excuse Petitioner's defaults.

This leaves the fundamental miscarriage of justice (actual innocence) gateway to excuse Petitioner's default. To show actual innocence to defeat a default, Petitioner must demonstrate that "'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'" *McQuiggins v. Perkins*, 569 U.S. 383, 386 (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). This is a "demanding" and "seldom met" standard. *McQuiggins*, 569 U.S. at 386 (citing *House v. Bell*, 547 U.S. 518, 538 (2006)). Petitioner must present new, reliable evidence that was not presented at trial --- such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence --- to make a credible claim of actual innocence. *House*, 547 U.S. at 537 (citing *Schlup*, 513 U.S. at 324); *see McDonald v. Lemke*, 737 F.3d 476, 483-84 (7th Cir. 2013) (quoting *Hayes v. Battaglia*, 403 F.3d 935, 938

(7th Cir. 2005) ("[A]dequate evidence is 'documentary, biological (DNA), or other powerful evidence: perhaps some non-relative who places him out of the city, with credit card slips, photographs, and phone logs to back up the claim.'")).

There is no new evidence suggesting that Petitioner is actually innocent. One of the victims, Tullio Infelise, identified Petitioner in multiple statements to the police before his death 16 days after the shooting. Additionally, Petitioner confessed to the crime and his girlfriend testified to his involvement in the killings. Petitioner cannot demonstrate he is actually innocent. *Hayes*, 403 F.3d at 938 ("[I]t is black letter law that testimony of a single eyewitness suffices for a conviction even if 20 bishops testify that the eyewitness is a liar."). Claim C is denied.

### D.    Claim D

Petitioner next alleges ineffective assistance of trial counsel because his attorney Robert McDonnell labored under a conflict of interest. In a pretrial proceeding, the prosecution raised the fact that McDonnell previously represented a member of victim Infelise's family. (Dkt. 23-1, pg. 5.) Petitioner then waived the conflict of interest from the prior representation on the record affirming he discussed the matter with McDonnell, and he wished to continue with McDonnell as his attorney. *Id*. at 5-6. The record does not detail which Infelise family member McDonnell previously represented that was the subject of the waiver. However, it is clear that Petitioner waived the conflict based on a prior representation. *Id*.

Petitioner testified at the postconviction hearing that McDonnell told him just before the trial commenced that he had previously represented either Tullio (the victim) or Rosario Infelise. *Post Conviction Appeal II*, 53 N.E.3d at 1058. Rosario and Tullio were brothers. *Direct Appeal*, 522 N.E.2d at 1152.

28

McDonnell allegedly told Petitioner that he represented Tullio on a legal matter "a long time ago," but could not recall it.  *Id.*  Petitioner later learned from court records that McDonnell represented Rosario Infelise in a criminal matter from January 1984, through August 15, 1984. *Id.*  Petitioner's in-court waiver occurred on September 19, 1984.  *Id.*

Petitioner alleges in the present habeas corpus petition that McDonnell never informed him that he was representing a "Ross Infelise."  (Dkt. 1, pg. 26.)  Petitioner does not explain whether Rosario Infelise is also known as Ross Infelise, but does allege that Ross Infelise is related to the victim, Tullio Infelise.  *Id.*  Petitioner's original postconviction appellate court decision refers to "Ross Infelise," *Post Conviction Appeal I*, 967 N.E.2d at 998, while his second postconviction appellate opinion has "Rosario Infelise."  *Post Conviction Appeal II*, 53 N.E.3d at 1057. Petitioner alleges that McDonnell continued to represent Ross Infelise through Petitioner's trial without informing Petitioner.  (Dkt. 1, pg. 26.)  Petitioner asserts he never waived the conflict.

Respondent is correct that this claim is procedurally defaulted.  Petitioner raised the alleged unwaived conflict of interest as to Ross / Rosario Infelise (it is irrelevant if this is the same person or two different people) before the trial and appellate courts in his postconviction proceeding.  *Post Conviction Appeal II*, 53 N.E.3d at 1063-65; *Post Conviction Appeal I*, 967 N.E.2d at 1002-04; (Dkt. 24-7, pg. 3.)  However, Petitioner did not raise an ineffective assistance of counsel claim regarding McDonnell's representation of Ross / Rosario Infelise in the postconviction PLA.  (Dkt. 24-10.)  The PLA is limited to the unrelated Maloney judicial bias issue.  There is nothing in the PLA regarding McDonnell's alleged representation of Rosario, Ross, or any other Infelise family member in the PLA.   The failure to raise the claim in the PLA results in the procedural default.  *Boerckel*, 526 U.S. at 842-46.

Additionally, as the Court explained above, Petitioner cannot excuse the procedural default. The default is the result of the failure to bring the claim in the postconviction PLA. Although Petitioner was represented by counsel in his postconviction PLA, ineffective assistance of postconviction appellate counsel is not cause to excuse a procedural default. *Steward*, 80 F.3d at 1212. Additionally, as discussed above, Petitioner cannot demonstrate a fundamental miscarriage of justice to excuse the default. Claim D is denied.

**E.     Claim E**

Petitioner asserts five allegations of ineffective assistance of counsel regarding McDonnell's performance.

First, Petitioner alleges that Officer Thomas Adamski, one of the case investigators, committed perjury in his grand jury testimony. Petitioner argues McDonnell was ineffective by failing to move for dismissal of the charges in light of Officer Adamski's alleged perjured grand jury testimony.

Second, Petitioner alleges that McDonnell was ineffective for stipulating to the admission of a medical record at Petitioner's suppression hearing. Petitioner alleges that his confession to the police was physically and mentally coerced. He alleges he suffered injuries to his kidneys from the assault by police officers during his interrogation. (Petitioner does not raise a coerced confession claim in the present habeas corpus petition.)

However, evidence was introduced in the suppression hearing that Petitioner's kidney injuries were the result of a prior auto accident that occurred before Petitioner's arrest. McDonnell allegedly stipulated to a medical document supporting the auto accident argument. Petitioner alleges that due to this stipulation, McDonnell wrongfully prevented himself from

introducing other evidence later in the hearing that supported Petitioner's view that the police injured his kidneys.

Third, victim Tullio Infelise, made a number of statements to the police during the 16 days that he survived following the shooting. Maloney allowed the introduction of some of these statements, while denying others. One statement Maloney did not allow to be introduced was a tape recorded statement. However, McDonnell allegedly committed ineffective assistance of counsel by inquiring about this tape recorded statement examining a witness at trial. This error "opened the door," allowing the prosecution to gain admission of the otherwise inadmissible tape recording.

Fourth, McDonnell failed to object to improper other crime evidence regarding Petitioner's use of cocaine.

Finally, Petitioner asserts that McDonnell was ineffective for failing to raise the remaining claims that he asserts in his habeas corpus petition. These claims are:

1. A Fourth Amendment violation when the officers wrongfully arrested him at his home.

2. The police wrongfully interrogated Petitioner after he invoked his right to counsel after his arrest.

3. Maloney wrongfully excused jurors from the case.

4. The prosecution wrongfully introduced impermissible out-of-court statements.

5. The prosecution wrongfully brought up the improper out-of-court statements during closing arguments.

6. There is insufficient evidence to support the conviction.

7. The prosecution examined Petitioner on improper topics.

8. A prior inconsistent statement was wrongfully introduced into evidence at trial.

9. The prosecutors wrongfully cross-examined Petitioner's wife on improper topics.

10. Petitioner's wife's gun was wrongfully introduced into evidence at trial.

11. Improper hearsay evidence was introduced at trial.

12. The prosecution's closing argument improperly minimized their burden of proof.

Respondent is correct that these arguments are procedurally defaulted. Petitioner did not raise the arguments on direct appeal. (Dkt. 24-1.) The first four ineffective assistance of counsel arguments were raised in the postconviction petition. (Dkt. 23-14, pg. 57-63.) However, none of the ineffective assistance of counsel arguments were presented in the postconviction appeals, (Dkt. 24-4, Dkt. 24-7.), or in his postconviction PLA. (Dkt. 24-10.) All of Petitioner's ineffective assistance of counsel arguments in this claim are procedurally defaulted. *Boerckel*, 526 U.S. at 842-46.

As previously discussed above, Petitioner cannot demonstrate cause and prejudice, nor fundamental miscarriage of justice. Of note, the failure of a postconviction attorney to raise a claim in a postconviction appeal or PLA does not excuse the default. *Steward*, 80 F.3d at 1212. Claim E is denied.

**F.    Claim F**

Petitioner next argues that his arrest and resulting confession to the police occurred in violation of his Fourth Amendment rights. Maloney, following a suppression hearing, ruled that there was both probable cause for Petitioner's arrest, and exigent circumstances excusing the warrantless arrest of Petitioner at his home. *Direct Appeal*, 522 N.E.2d at 1152-53. The Supreme Court of Illinois on direct appeal affirmed Maloney's ruling. *Id*. Maloney, as the finder of fact, was accorded deference by the Supreme Court of Illinois. *Id*. at 1152 ("A reviewing court

will not disturb a trial court's ruling on a motion to quash arrest unless that finding is manifestly erroneous."). The Supreme Court of Illinois's decision on direct appeal was issued three years before Maloney was indicted in federal court. *Maloney*, 71 F.3d at 649; *Direct Appeal*, 522 N.E.2d at 1146.

### 1. *Stone v. Powell*

Respondent asserts this claim is barred by *Stone v. Powell*, 428 U.S. 465, 494 (1976)). Respondent does not address whether a Fourth Amendment claim resolved by a corrupt judge is considered a "full and fair" process in accordance with *Stone*. The Seventh Circuit answers, "no."

"*Stone v. Powell*, bars a federal habeas court from reaching the merits of a petitioner's Fourth Amendment claim so long as the state court granted him a full and fair hearing on the claim." *Monroe v. Davis*, 712 F.3d 1106, 1112 (7th Cir. 2013) (citing 428 U.S. 465, 494 (1975)). "[A] state court process that amounts to a sham would not constitute a full and fair hearing even though petitioner had his day in court on the claim." *Monroe*, 712 F.3d at 1114 (citing *Cabrera v. Hinsley*, 324 F.3d 527, 530-31 (7th Cir. 2003); *Hampton v. Wyatt*, 296 F.3d 560, 563-64 (7th Cir. 2002)). "Absent a subversion of the hearing process," such as if the trial judge "has his mind closed to the necessity of a hearing, was **bribed**," believes that "probable cause is not required," is "sleepwalking," or "in some other obvious way was subvert[ing] the hearing," a prisoner cannot challenge its result in a federal habeas corpus proceeding. *Cabrera*, 324 F.3d at 531-32 (emphasis added). "In short, 'full and fair' guarantees the right to present one's case, but it does not guarantee a correct result." *Id*. at 532.

It is well documented that Maloney engaged in extensive bribery and corruption as a judge, and, in Petitioner's case, there is the alleged unsuccessful bribe by his codefendent. The Supreme

33

Court stripped Maloney of the presumption that he properly discharged his official duties because of his documented history of corruption. *Bracy*, 520 U.S. at 909. *Cabrera* mentions a bribed judge as an example of the subversion of the hearing process such that the full and fair requirement is not met. In light of Maloney's documented corruption, the Court holds that Petitioner did not receive a full and fair opportunity to raise his Fourth Amendment claim. Consequently, the *Stone v. Powell* exclusion does not apply in this case. *Cabrera*, 324 F.3d at 531-32.

It should be noted that although both the *Stone* full and fair analysis and the previously discussed judicial bias claim consider bribery, they are different standards. As explained above, Petitioner had the burden of showing Maloney was actually biased against him in his judicial bias claim. *Bracy*, 520 U.S. at 905. There is no similar requirement of showing the judge's malice towards Petitioner when demonstrating a lack of a full and fair hearing under *Stone*. *Cabrera*, 324 F.3d at 531. *Stone* requires only that the judge subverted the process. *Id*. A corrupt judge, although not biased, is certainly a subversion of the criminal justice system.

The examples given by *Cabrera* illustrate this point. A sleepwalking judge or a judge who is so incompetent that he does not understand that probable cause applies in a Fourth Amendment analysis do not automatically require a finding of bias against a petitioner. They can be fair and impartial, and yet incapable of performing their judicial duties so that the result is subversion of the process under *Stone*. Equally, Maloney's corrupt presence, although there is no indication that he was actually biased against Petitioner, is still a subversion of the process. This is why the Court can find that Maloney's history of bribery results in the denial of a full and fair hearing, but still deny the judicial bias claim.

The existence of different remedies is an additional item of support for why this Court could find there was no full and fair hearing under *Stone*, but still reject the judicial bias claim. The showing of actual bias by a judge requires automatic reversal; no additional consideration of a prisoner's constitutional claims is required. *Edwards*, 520 U.S. at 647. But, the showing that there was no full and fair opportunity under *Stone* simply lifts *Stone's* prohibition on bringing a Fourth Amendment claim in a habeas corpus case, the petitioner still must demonstrate a Fourth Amendment violation. *Monroe*, 712 F.3d at 1113. Petitioner receives less of a remedy here, simply removing the *Stone* prohibition allowing a consideration of the Fourth Amendment case. Thus, so it is reasonable that there is less demanding of a proof requirement. Respondent's argument that Petitioner's claim is barred by *Stone v. Powell* is rejected, and so the Court turns to the substance of Petitioner's Fourth Amendment claim.

### 2. The AEDPA and Maloney

Because Petitioner's Fourth Amendment claim was adjudicated by the state court, the Court applies the AEDPA. *Harris*, 698 F.3d at 623. The AEDPA requires this Court to grant "a deference and latitude" to the state court's adjudication of the claim. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). This leads to the very difficult question of whether Congress intended a federal court to give deference to a state court decision under the AEDPA when a corrupt judge was involved in the ruling under review. Put another way, does the AEDPA mandate that this Court must defer to felonious judge Maloney?

The Court has not located binding precedent from the Supreme Court or the Seventh Circuit on this question. The only case the Court has found directly addressing the issue is *United States ex rel. Hooper v. Ryan*, 854 F. Supp. 2d 546 (N.D. Ill. 2012) (Gottschall, J.), *vacated*, 729 F.3d

782 (7th Cir. 2013). Recognizing the concern, Judge Gottschall expressed that she was "uncomfortable with the idea of deferring to Maloney in any way," but ultimately applied AEDPA deference to decisions involving Maloney's rulings. *Id*. at 573. The Seventh Circuit vacated Judge Gottschall's opinion on an unrelated basis. *Hooper*, 729 F.3d at 787. The Seventh Circuit's ruling was not required to address whether Maloney's judicial decisions were deserving of deference because it resolved the case on other grounds. *Id*.

The Court shares Judge Gottschall's concerns.[3] It is not lost on the Court that under the AEDPA, the Court must afford judicial deference to the rulings of a judge "shown to be thoroughly steeped in corruption" of his judicial office. *Bracy*, 520 U.S. at 909.

But, the AEDPA appears to provide no safe harbor for this situation. In a different context, the Supreme Court instructed that "[b]y its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in the state court, subject only to the exceptions of §§ 2254(d)(1) and (2)." *Harrington*, 562 U.S. at 98. There is nothing in the language of the AEDPA that suggests the Court should not apply the AEDPA standard even when that means having to defer to a corrupt judge's rulings. This Court finds, however, that the AEDPA is not outcome determinative on issues involving Maloney's judicial decisions as even if Court reviewed the claims involving Maloney's rulings without any deference to him, it would still reject Petitioner's claims.

### 3. Petitioner's Fourth Amendment Claim

In denying Petitioner's Fourth Amendment claim, Maloney held that there was "abundant" probable cause for the arrest, and exigent circumstances supported the warrantless arrest of

---

3 The Court, of course, has no similar reservation in applying the AEDPA to claims that Maloney had no involvement in adjudicating in the jury trial.

Petitioner at his home. *Direct Appeal*, 522 N.E.2d at 1152. The Supreme Court of Illinois agreed there was probable cause. *Id*. at 1153. On the exigent circumstances question, the Court was less definitive, stating instead that Maloney's exigent circumstances finding was not against the manifest weight of the evidence. *Id*.

To arrest a person in his home, there must be: (1) probable cause and a warrant; (2) in the absence of a warrant, probable cause and exigent circumstances; or (3) consent. *New York v. Harris*, 495 U.S. 14, 16 (1990); *Payton v. New York*, 445 U.S. 573, 590 (1980). A warrantless arrest at a home that is supported by probable cause does not render the continued custody of the arrestee unlawful once he is taken from his home. *Harris*, 495 U.S. at 18.

There is no doubt there was probable cause for Petitioner's arrest. Tullio Infelise identified "Robert Gott," or "Gotch" as the assailant immediately after being freed from the trunk. *Direct Appeal*, 522 N.E.2d at 1151. The victim was found inside a trunk, shot, hands bound behind his back, and next to his dead uncle's body. *Id*. at 1155-56. He repeated his identification of Petitioner multiple times throughout that day, including saying it was "Robert Gacho" who shot him. *Id*. at 1152. The police's investigation learned from Infelise's brother, Frank, that the victims might have gone to Petitioner's house the night before. *Id*.

To find probable cause, the arresting officer must know sufficient facts that, when considering the totality of the circumstances, would lead a reasonable person to believe that the arrestee committed a crime. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). The victim identified the Petitioner as the man who shot him, and the victim's brother suggested that the victims were at Petitioner's home the night before. There was probable cause to support the arrest.

*New York v. Harris*, 495 U.S. 14 (1990), controls the rest of the analysis. As the police in this case had "probable cause to arrest [Petitioner], the exclusionary rule does not bar the State's use of a statement made by [Petitioner] outside of his home" regardless of whether his original arrest was proper. *Id*. at 21. There is no Fourth Amendment infirmity in light of *Harris*. Claim F is denied.

## G.    Claim G

Petitioner next asserts a Fifth Amendment claim, contending that the police continued to question him at the police station following his arrest despite his request for a lawyer. This claim was adjudicated on direct appeal.

Petitioner testified at the suppression hearing that the police continued asking questions during the interrogation even though he requested to speak to a lawyer. *Direct Appeal*, 522 N.E.2d at 1153. The officers allegedly ignored his request, and one officer repeatedly told him that he had been involved in a shooting. *Id*. The officer also allegedly physically struck Petitioner, and told Petitioner to not tell the assistant state's attorney coming to take Petitioner's statement that the police assaulted him. *Id*. Petitioner conceded that he was able to use the phone prior to speaking to the assistant state's attorney. *Id*. Petitioner called a friend about finding a lawyer, but he could not reach the friend. *Id*. He also conceded he did not tell the assistant state's attorney about not getting in touch with his friend, and did not request a lawyer from the assistant state's attorney. *Id*.

The officers testified that they read Petitioner his *Miranda* rights, and then he acknowledged and waived them. *Id*. The officers denied assaulting Petitioner. *Id*. The assistant state's attorney said that Petitioner made no complaints to him. *Id*.

Maloney found the officers credible, and Petitioner incredible.   *Id*. at 1154.   The Supreme Court of Illinois affirmed that ruling.   *Id*.   Petitioner now challenges this ruling, arguing his request for an attorney was not respected.   Notably, he does not raise any argument regarding the alleged physical abuse by the officers.

When an accused invokes his right to counsel during a custodial interrogation, the police must cease questioning until counsel is made available to the defendant and he initiates further communication with the police.   *Edwards v. Arizona*, 451 U.S. 477, 484 (1981); *Miranda v. Arizona*, 384 U.S. 436, 474 (1966).   However, once a suspect knowingly and voluntarily waived his *Miranda* rights, the police may continue questioning until the suspect makes a clear request for an attorney.   *Davis v. United States*, 512 U.S. 452, 459 (1994); *Edwards*, 451 U.S. at 485.

Thus, the question is whether Petitioner invoked his right to counsel as he claims.   The record supports the view that Petitioner did not invoke his right to counsel.   Notably, Petitioner admitted that he never told anyone that he was unable to contact his friend during his phone call in police custody.   Additionally, there is no dispute that Petitioner failed to tell the Assistant State's Attorney about his alleged desire to have a lawyer.   These factual findings are due a presumption of correctness under the AEDPA, 28 U.S.C. § 2254(e)(1), and even outside of the AEDPA under *de novo* review the Court would still find the state supreme court ruling proper.

Finally, even if the statement was wrongfully admitted in violation of *Miranda*, the error is harmless.   An error is harmless unless it has a substantial and injurious effect or influence in determining the jury's verdict.   *Fry v. Pliler*, 551 U.S. 112, 116 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)).   Even without the confession, the evidence is

overwhelming. Tullio Infelise identified Petitioner as the shooter, and Petitioner's girlfriend testified at length about Petitioner's involvement in the crime. Claim G is denied.

H.      **Claim H**

Petitioner alleges a prospective juror was improperly excluded pursuant to *Witherspoon v. Illinois*, 391 U.S. 510 (1986). Respondent is correct that the claim is procedurally defaulted because the claim was not properly preserved at trial, and only reviewed on appeal via plain error. *Direct Appeal*, 522 N.E.2d at 1154-55.

Illinois law requires a defendant to make both a contemporaneous objection and preserve the issue in a timely post-trial motion. *Miranda v. Leibach*, 394 F.3d 984, 992 (7th Cir. 2005). Claims that are not properly preserved in the Illinois trial courts are reviewed only under plain error. *Kaczmarek v. Rednour*, 627 F.3d 586, 594 (7th Cir. 2010). The failure to bring a proper objection and preserve the issue for appeal is an adequate and independent state procedural ground of review resulting in procedural default of the claim in the federal habeas corpus proceeding. *Id*. The fact that the state court engaged in a plain error review does not defeat the procedural default. *Id*. Furthermore, as explained above, Petitioner cannot excuse his defaults through either cause and prejudice, nor fundamental miscarriage of justice. Claim H is denied.

I.      **Claim I**

Petitioner next challenges the introduction at his trial of Tullio Infelise's out of court statements given to the police immediately after he was rescued from the car trunk. The forest preserve officer asked Infelise, "who did this to you?" when Infelise was rescued from the trunk. *Direct Appeal*, 522 N.E.2d at 1155. Infelise responded "Robert Gott or Gotch." *Id*. The

40

statement was permitted at trial under the spontaneous declaration exception to the hearsay rule. *Id.*

To the extent that Petitioner seeks to challenge the application of Illinois evidentiary rules at his trial, he is barred because errors in state law are not cognizable in a federal habeas corpus proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). It is true that evidentiary errors can rise to the level of a due process violation, but only if the "error produced a significant likelihood that an innocent person has been convicted." *Anderson v. Sternes,* 243 F.3d 1049, 1054 (7th Cir. 2001). As previously explained, the evidence of Petitioner's guilt is overwhelming.

The introduction of an out of court statement does implicate the Sixth Amendment confrontation right, and although Petitioner's argument appears to be mostly regarding hearsay, he does make a reference to the Sixth Amendment in his petition. The Supreme Court of Illinois's decision on direct appeal, which is the relevant decision for this Court's analysis under the AEDPA, was issued in 1988. The controlling standard regarding this claim is from *Ohio v. Roberts*, 448 U.S. 56 (1980).

Despite being subsequently overruled by *Crawford v. Washington*, 541 U.S. 36 (2004), the Court must apply *Roberts* in this case for two reasons. First, the AEDPA requires that the Court evaluate whether the state court decision conflicted with clearly established federal law from the Supreme Court at the time of the relevant decision. *Shoop v Hill*, 139 S. Ct. 504, 506 (2019). The Court applies *Roberts*, not *Crawford*, because *Roberts* was the controlling precedent at the time of the Supreme Court of Illinois's decision in 1988. *Smith v. McKee*, 598 F.3d 374, 387 (7th Cir. 2010) (applying *Roberts* instead of *Crawford* because *Roberts* was the controlling precedent at the time of the relevant state court decision). Second, *Crawford* does not apply retroactively in

41

a habeas corpus proceeding under *Teague v. Lane*, 489 U.S. 288 (1989). *Whorton v. Bockting*, 549 U.S. 406, 409 (2007).

Under *Roberts*, an out of court statement by an unavailable witness is admissible at trial so long as the statement "bore 'adequate indicia of reliability.'" *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (quoting *Roberts*, 448 U.S. at 66). "Such indicia are present" ""if the evidence falls within a firmly rooted hearsay exception' or bears 'particularized guarantees of trustworthiness.'" *Clark*, 135 S. Ct. at 2179 (quoting *Roberts*, 448 U.S. at 66).

Infelise was unavailable because he died prior to Petitioner's trial. Furthermore, his statement bore adequate indicia of reliability because spontaneous declaration is a firmly rooted hearsay exception under *Roberts*. *White v. Illinois*, 502 U.S. 346, 355-56 n.8 (1992) (recognizing spontaneous declaration is a firmly rooted hearsay exception under *Roberts*); *Smith v. Fairman*, 862 F.2d 630, 636 (7th Cir. 1988) (same).

Petitioner counters that the statement does not qualify under the spontaneous declaration exception to hearsay because Infelise's statement was made six and half hours after he was shot. "The spontaneous declaration exception applies to 'a statement related to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.'" *White*, 502 U.S. at 350 n.1 (quoting *Illinois v. White*, 555 N.E.2d 1241, 1246 (Ill. App. Ct. 1990)). While a lapse in time is relevant, all that is required is that the ""statement be made contemporaneously with the excitement resulting from the event, not necessarily with the event itself.'" *Smith v. Fairman*, 862 F.2d 630, 636 (7th Cir. 1988).

While six and half hours elapsed between the shooting and Infelise's statement, he was rescued from the trunk moments before he made the statement. Infelise, who was robbed,

kidnapped, bound, shot, bleeding, and stuffed in a trunk with his murdered uncle for six and half hours before his rescue, was clearly under the stress of the startling condition when he made the statement immediately upon being rescued from the trunk. Because, the statement was properly admitted under the spontaneous declaration exception, there is no confrontation issue under *Roberts*. Claim I is denied.

### J.      Claim J

Petitioner challenges the prosecution's closing argument regarding a statement by Infelise given to the police at the hospital following his rescue from the car trunk. Infelise was taken to the hospital following his rescue from the trunk. The police officer leading the investigation went to the hospital to speak to Infelise, who told the officer that Petitioner was the assailant. *Direct Appeal*, 522 N.E.2d at 1158. The officer then went to Chicago to look for Petitioner. *Id*.

Maloney granted Petitioner's pretrial motion *in limine* to bar the introduction of Infelise's statement identifying Petitioner given to the police at the hospital. *Id*. The prosecution, however, was allowed to elicit from the officer at trial that he went to the hospital to speak to Infelise, and then went to Chicago to look for Petitioner. *Id*.

In closing arguments, the prosecutor summarized the officer's testimony as the officer got "that defendant's name from the lips of Tullio Infelise" while he was at the hospital. *Id*. Maloney sustained Petitioner's objection, but denied the mistrial motion. *Id*. The prosecution went on to point out that the officer also obtained information about Petitioner from police records. *Id*. Petitioner now challenges the trial testimony and the prosecutor's closing argument.

There is no constitutional issue as to the trial testimony. As the Supreme Court of Illinois recognized, there was no hearsay in the officer's trial testimony because he limited his testimony

to the course of his investigation without including Infelise's statement at the hospital. *Direct Appeal*, 522 N.E.2d at 248. There is no due process issue because there was no error. Additionally, there is no confrontation clause issue because the confrontation clause is not implicated by non-hearsay statements. *Tennessee v. Street*, 471 U.S. 409, 417 (1985).

The Supreme Court of Illinois correctly recognized that the prosecutor's comments at closing argument were improper. *Direct Appeal*, 522 N.E.2d at 249. That court went onto hold the error did not result in reversable error. *Id*. The court, however, did not apply the *Chapman v. California*, 386 U.S. 18 (1967), standard instead applying Illinois's plain error standard. *Direct Appeal*, 522 N.E.2d at 249. This is a mistake, but is not sufficient to grant habeas corpus relief.

Illinois courts review under the plain error standard when a claim is not preserved for appellate review. *Kaczmarek*, 627 F.3d at 594. Here, the defense attorney made a timely objection to the prosecutor's argument. The state supreme court opinion does not hold that the claim was not properly preserved. The state court erred by applying plain error when it should have applied *Chapman*. The ruling is contrary to *Chapman* under 28 U.S.C. § 2254(d)(1). However, Petitioner must still meet the *Brecht* standard. *Davis v. Ayala*, 135 S. Ct. 2187, 2198-99 (2015) (explaining that even when the state court errs in applying *Chapman*, the federal habeas corpus court must still perform he *Brecht* analysis).

Despite the error, Petitioner cannot meet the *Brecht* standard of showing the error had a substantial and injurious effect or influence in determining the jury's verdict. 507 U.S. at 631. As previously discussed, the evidence of Petitioner's guilt is overwhelming. Infelise identified Petitioner as the assailant immediately upon being freed from the trunk. Petitioner confessed to the police, and his girlfriend testified to the crime. Claim J is denied.

### K.    Claim K

Petitioner challenges the sufficiency of the evidence regarding Infelise's murder. Infelise survived for 16 days following the shooting. *Direct Appeal*, 522 N.E.2d at 1156. He would die from his gunshot wounds and, secondarily, massive blood clots in his lungs. *Id*. Although the blood clots were the immediate cause of death, the autopsy doctor testified at trial that the gun shots were the "real cause." *Id*. Infelise required extensive surgery due to his gunshot wounds. *Id*. He developed the blood clots due to the surgery for the wounds. *Id*. Without the gunshots wounds, there would have been no surgery, and no blood clots in his lungs. *Id*.

In rejecting the sufficiency of the evidence challenge on direct appeal, the Supreme Court of Illinois explained that Petitioner's act did not need to be the sole and immediate cause of a Petitioner's death. *Id*. Thus, it was up to the jury to determine if there was a causal connection between the gunshots and Petitioner's death. *Id*.

Petitioner argues in the present claim that Infelise did not die from his gunshot wounds. He claims the doctor admitted on cross examination that Infelise seemed to be on the road to recovery, being up and around at the hospital, before he died.

The Court's applies a "twice-deferential standard" in reviewing the state court's ruling on the sufficiency of the evidence claim. *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam). First, the Court must defer to the verdict. "'[I]t is the responsibility of the jury --- not the court --- to decide what conclusions should be drawn from evidence admitted at trial.'" *Parker*, 567 U.S. at 43 (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam)). "The evidence is sufficient to support a conviction whenever, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond

45

a reasonable doubt.'" *Parker*, 567 U.S. at 43 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).   Second, the Court defers to the state court ruling under the AEDPA.   28 U.S.C. § 2254(d).

Petitioner's sufficiency of the evidence argument is rejected.   The autopsy doctor opined that Infelise died from his gunshot wounds.   The jury could reasonably credit the doctor's testimony.   Infelise would not have had multiple surgeries had he not been shot.   The blood clots that killed Infelise are a direct result of the gunshot wounds.   Claim K is denied.

## L.    Claim L

Petitioner argues that Maloney erred in allowing the prosecution to cross examine him on matters outside the scope of direct examination, and that these topics unduly prejudiced him before the jury.   He alleges improper cross examination as to: (1) his use of cocaine; and, (2) letters he wrote to De Wulf while in pretrial custody at the Cook County Jail.

As to the cocaine issue, the Supreme Court of Illinois held that the issue was not preserved through a timely objection and post trial motion.   *Direct Appeal*, 522 N.E.2d at 1157.   This resulted in procedural default of the issue.   *Kaczmarek*, 627 F.3d at 594.   As previously explained, Petitioner cannot demonstrate cause and prejudice, or fundamental miscarriage of justice.   This argument is denied.

The Court turns to the merits of the other two arguments in this claim.   As a general principle, the scope of cross examination involves a non cognizable question of state evidentiary law.   *Estelle*, 502 U.S. at 67-68.   However, the cross examination of a criminal defendant can implicate constitutional concerns.

A defendant's privilege against self-incrimination is waived when the defendant chooses to take the stand on his own behalf at trial. *Ohler v. United States*, 529 U.S. 753, 759 (2000); *McGautha v. California*, 402 U.S. 183, 215 (1971). Following his direct testimony, the prosecution may conduct cross examination on matters reasonably related to the subject of his direct examination. *Ohler*, 529 U.S. at 759; *McGautha*, 402 U.S. at 215.

The use of Petitioner's letters to De Wulf on cross examination was proper. De Wulf is a primary source of evidence against Petitioner. Petitioner testified on direct examination that he and De Wulf stopped dating in October 1982, but she still came around to see him at his auto shop. *Direct Appeal*, 522 N.E.2d at 1151. This conflicted with De Wulf's testimony that she was Petitioner's girlfriend at the time of the killings. *Id.*

The issue of De Wulf and Petitioner's relationship goes to the question of De Wulf and Petitioner's truthfulness. Their relationship was relevant because the jury could reasonably believe that Petitioner would turn to someone he was dating for help, or alternatively a spurned lover would have a reason to lie.

The letter Petitioner wrote to De Wulf while at the Cook County Jail following his arrest demonstrated that De Wulf was truthful on this point. Petitioner signed one letter, "Love, your future husband, Bob," and in another he writes, "Hi, Sweetheart, I love you." *Id.*

Further, Petitioner denied any involvement in the murders. *Id.* at 1151. The prosecution permissibly used the letters to show Petitioner's consciousness of guilt. In one letter, Petitioner wrote De Wulf encouraging her to not testify, saying the defense attorneys "set their case up knowing and hoping you wouldn't be in court." *Id.* at 1158. He also encouraged her to leave

Chicago and stay away. *Id.* at 1157. She stayed with her sister in Arkansas for a period before the trial. *Id.* Petitioner wrote De Wulf that he hoped to escape. *Id.*

The letters were used to rebut Petitioner's direct examination testimony denying his involvement in the murders, and that he was dating De Wulf at the time of the murders. Petitioner's Fifth Amendment rights were not implicated because the cross examination was reasonably related to subjects covered in his direct examination. Finally, even if there was an error in the scope of cross examination, consistent with the explanation in prior sections, Petitioner cannot satisfy the *Brecht* standard. Claim L is denied.

**M.    Claim M**

Petitioner next challenges the introduction of De Wulf's prior consistent statement to bolster her credibility. De Wulf was cross examined regarding whether she provided testimony implicating Petitioner out of fear of being charged with perjury. *Direct Appeal*, 522 N.E.2d at 1159. She originally gave a statement during the investigation to the state's attorney's office, but a week later gave a statement to Petitioner's attorney stating she lied in the first statement out of fear of arrest. *Id.* The first statement was then introduced to rebut the argument that she was fabricating and testifying at trial only out of fear of prosecution. *Id.* The state supreme court held that the statement was made prior to the existence of any concern she had regarding being charged with a crime. *Id.* Petitioner believes the introduction of this statement is improper.

Petitioner's argument does not implicate a constitutional concern. The introduction of De Wulf's out of court statement does not implicate the Confrontation Clause because she was available to testify and be cross examined. *California v. Green*, 399 U.S. 149, 164 (1970). Additionally, although the Supreme Court has not spoken to the question of whether the admission

of this evidence violates due process or some other type of constitutional concern, it has held, as a matter of the Federal Rules of Evidence, that prior consistent statements are permissible to rebut a charge of fabrication or improper motive. *Tome v. United States*, 513 U.S. 150, 157-58 (1995) (citing Fed. R. Evid. 801(d)(1)(B)). The Court finds that there is no due process constitutional concern with the introduction of these statements in Petitioner's state criminal cases, when federal courts allow the introduction of this type of statement. *Henyard v. Butler*, No. 15 C 2324, 2016 WL 5171783, at *9 (N.D. Ill. Sept. 21, 2016). Claim M is denied.

### N.    Claim N

Petitioner next challenges the cross examination of his wife, and associated testimony by Officer James Coakley. *Direct Appeal*, 522 N.E.2d at 1161. Petitioner confessed at the police station following his arrest, but repudiated the confession at trial. *Id*. at 1151. Mrs. Gacho testified in support of Petitioner's position by detailing her treatment at the police station on the same evening that Petitioner confessed. *Id*. at 1160. She testified that she told the police Petitioner was home that evening, and that she fell asleep in the bedroom. *Id*. According to Mrs. Gacho, her treatment by the police was "'more like they were telling me what happened, and I was supposed to agree with them.'" *Id*.

The prosecution tendered Officer Coakley as a rebuttal witness to Mrs. Gacho's testimony. *Id*. Coakley testified that Mrs. Gacho told him that evening at the police station that the defendants --- Sorrentino, Titone, and Petitioner --- were sitting at the kitchen table in Petitioner's home at 9:30 p.m. on the evening of the murders. *Id*. Petitioner retrieved a .38 caliber handgun from the bedroom that he gave to Sorrentino. *Id*.

According to Coakley, Mrs. Gacho told him that she overheard pieces of the assailants' conversation in which they discussed robbing the victims. *Id*. The victims arrived at the home and the five men smoked cocaine from pipes. *Id*. She went to the bathroom to clean the pipes, and found the men were gone when she returned to the kitchen. *Id*. Petitioner told his wife that the two victims were in the basement. *Id*. She then went to bed. *Id*. Coakley denied threatening Mrs. Gacho or threatening to take her children away. *Id*.

The Supreme Court of Illinois held that Coakley's testimony was proper impeachment because it went to the subject of Mrs. Gacho's testimony. *Id*. at 1161. Furthermore, that court rejected Petitioner's argument that Maloney should have instructed the jury that that Coakley's testimony was to be only considered for impeachment purposes, and not substantive evidence, because that argument was not preserved on appeal. *Id*. Petitioner now renews these arguments before this Court that it was improper to allow Coakley to testify as to Mrs. Gacho's statement implicating Petitioner, and also that Maloney should have issued a limiting instruction to the jury.

To the extent that Petitioner is challenging the state's evidentiary ruling as a matter of state law, that argument is not cognizable in a federal habeas corpus proceeding. *Estelle*, 502 U.S. at 67-68. Further, any alleged error does not implicate due process because it does not result in a "significant likelihood that an innocent person has been convicted." *Anderson*, 243 F.3d at 1054.

The Supreme Court of Illinois was correct that Coakley's impeachment testimony is proper. Petitioner repudiated his confession, and Mrs. Gacho testified regarding alleged police mistreatment that she received at the same time. Petitioner presented Mrs. Gacho's testimony to bolster his own allegations of police misconduct that he was using to challenge the confession.

The prosecution had a right to respond by presenting the statement that Mrs. Gacho gave them at that time that was in conflict with Mrs. Gacho's testimony.

Moreover, the introduction of Coakley's statement to impeach Mrs. Gacho is a collateral matter that does not alter the fact that there is overwhelming evidence of Petitioner's guilt, including Infelise's statements that Petitioner was the assailant, and De Wulf's testimony.

Finally, Respondent is correct that an argument regarding the lack of a limiting instruction to the jury is procedurally defaulted because it was not properly preserved before the Supreme Court of Illinois. *Kaczmarek*, 627 F.3d at 594. And, as explained above, Petitioner cannot excuse his default through cause and prejudice, nor fundamental miscarriage of justice. Claim N is denied.

### O. Claim O

Petitioner next challenges the introduction of a .38 caliber Charter Arms gun recovered from the bedroom dresser at his home. *Direct Appeal*, 522 N.E.2d at 1161. Petitioner argues this gun was improperly introduced at trial because it is his wife's gun and is unrelated to the case.

There are four guns discussed in the case: (1) the aforementioned .38 Charter Arms; (2) a .25 caliber automatic recovered at the crime scene; (3) a Smith and Wesson .38 special revolver also recovered at the crime scene; and, (4) a Colt Python .357 magnum that Petitioner carried with him when riding with De Wulf that was also recovered at Petitioner's home. *Id*.

The Supreme Court of Illinois found the claim was waived because it was not properly preserved at trial. The claim is procedurally defaulted. *Kaczmarek*, 627 F.3d at 594. As explained above, Petitioner cannot excuse his default through either cause and prejudice, nor fundamental miscarriage of justice.

Moreover, the claim is also meritless. To the extent that Petitioner is challenging the state's evidentiary ruling as a matter of state law, that argument is not cognizable in a federal habeas corpus proceeding. *Estelle*, 502 U.S. at 67-68. Further, any alleged error does not implicate due process because it does not result in a "significant likelihood that an innocent person has been convicted" in light of the overwhelming evidence against Petitioner. *Anderson*, 243 F.3d at 1054. Claim O is denied.

### P.        Claim P

Petitioner next challenges the use of a medical record from Cermak Health Services, the medical facility serving Cook County Jail inmates, at his trial. As mentioned above, Petitioner repudiated his confession at trial, asserting that the police coerced his confession through physical and mental coercion. The prosecution called Andre Watkins, an emergency medical technician who examined Petitioner at Cermak. *Direct Appeal*, 522 N.E.2d at 1161. Watkins testified as to Petitioner's physical condition on January 6, 1983, approximately three weeks after he was taken into police custody and following his confession. *Id.* The challenged confession occurred the day Petitioner was taken into custody.

Watkins based his testimony on a medical report that was not entered into evidence. *Id.* Watkins was asked the name of the inmate appearing on the report. *Id.* He responded, "Robert Gacho, also known as Robert Gotch." *Id.* at 1162. Petitioner objected and moved for a mistrial arguing there was no evidence he was ever known as Robert Gotch. *Id.* Maloney granted the objection and instructed the jury to disregard the portion of the testimony regarding the "also known as" material. *Id.* The Supreme Court of Illinois rejected Petitioner's challenge, holding

that Watkins' testimony was relevant and admissible, and he was subject to in-court cross examination. Petitioner now renews the argument.

The claim is meritless. To the extent that Petitioner is challenging the state's evidentiary ruling as a matter of state law, that argument is not cognizable in a federal habeas corpus proceeding. *Estelle*, 502 U.S. at 67-68. Further, any alleged error does not implicate due process as it does not result in a "significant likelihood that an innocent person has been convicted" in light of the overwhelming evidence against Petitioner. *Anderson*, 243 F.3d at 1054.

Maloney instructed the jury to disregard the "also known as" testimony. Jurors are presumed to follow their instructions. *Blueford v. Arkansas*, 566 U.S. 599, 606 (2012). The Supreme Court of Illinois was correct that the rest of the testimony was proper. Petitioner repudiated his confession at trial arguing it was coerced. The prosecution rightfully presented evidence regarding Petitioner's physical condition a few weeks later in an attempt to show there was no medical support for his allegations. And, as mentioned above, the evidence of Petitioner's guilt is overwhelming. Claim P is denied.

**Claim Q**

Petitioner challenges the prosecution's closing arguments regarding the proof beyond a reasonable doubt standard. The prosecutor stated, "There's nothing magical about proving someone guilty beyond a reasonable doubt. It happens every time a person is convicted in this courtroom. It happens in every courtroom in this building, in every criminal court building in this country, every county in this state and every state in this country." *Direct Appeal*, 522 N.E.2d at 1162. The Supreme Court of Illinois concluded the comments were proper because they did not reduce the burden of proof. *Id*.

The challenged prosecutorial comments are reviewed under *Darden v. Wainwright*, 477 U.S. 168 (1986). *Bartlett v. Battaglia*, 453 F.3d 796, 801 (7th Cir. 2006). Under *Darden*, the Court considers: (1) whether the statements were improper; and, (2) whether Petitioner was prejudiced? *Bartlett*, 453 F.3d at 802 (citing *Ruvalcaba v. Chandler*, 416 F.3d 555, 565 (7th Cir. 2005)). Prejudice is evaluated by considering: (1) whether the prosecution misstated the evidence; (2) whether the remark implicated a specific right of the accused; (3) whether the defense invited the response; (4) the trial court's instructions; (5) the weight of the evidence against Petitioner; and, (6) Petitioner's opportunity to respond. *Bartlett*, 453 F.3d at 802 (citing *Darden*, 477 U.S. 181-82; *Howard v. Gramley*, 225 F.3d 784, 793 (7th Cir. 2000)).

The Court cannot find that the statement was improper under the deferential AEDPA standard. The prosecution made an accurate statement that does not misstate the burden of proof. *See Gray v. Garza*, No. CV 18-613-DSF (KK), 2018 WL 4961659, at *6 (C.D. Cal. Aug. 17, 2018). But, one is "playing with fire" when making an argument that may improperly alter the reasonable doubt standard. *United States v. Langer*, 962 F.2d 592, 600 (7th Cir. 1992). For example, the prosecutor's argument could arguably be construed to imply that convictions are so widespread and routine that the jury need not give much thought to its job. However, as this case is before the Court on the deferential AEDPA standard, the Court concludes the state court's determination that there was no error with the prosecutor's comment is not an unreasonable determination.

Additionally, in considering the six factors for evaluating prejudice, the Court finds the factor of the weight of the evidence against Petitioner dispositive. As previously mentioned, the weight of the evidence against Petitioner is overwhelming, including his identification by the

victim, Petitioner's own confession, and Petitioner's girlfriend's testimony. *See Calhoun v. Peters*, No. 93 C 6897, 1996 WL 535193, at *5 (N.D. Ill. Sept. 18, 1996) (holding that prosecution's argument of "reasonable doubt happens every single day in this country," did not result in prejudice due to the overwhelming nature of the evidence against the prisoner). Claim Q is denied.

### R.    Claim R

Petitioner's final argument is that his appellate attorney on direct appeal was ineffective for failing to raise the claims that he now asserts in Claims B through E. Petitioner failed to preserve this argument before the Illinois courts, resulting in procedural default. *Boerckel*, 526 U.S. at 842-46. As explained above, Petitioner cannot excuse his defaults through either cause and prejudice or fundamental miscarriage of justice.

Beyond the default, Petitioner's attorney could not raise Claims B, C and D and parts of Claim E on direct appeal because they involved matters outside the trial record. *See Illinois v. Ligon*, 940 N.E.2d 1067, 1074-75 (Ill. 2010) (instructing that ineffective assistance of counsel arguments may be brought on direct appeal only when they are supported by the record, and those that are not should be brought in a postconviction petition). Claim R is denied.

All claims are denied. The habeas corpus petition is denied on the merits.

### III.    Certificate of Appealability and Notice of Appeal Rights

The Court grants a certificate of appealability as to Claim B, the judicial bias claim, and declines to issues a certificate of appealability as to all other claims. For a certificate of appealability to issue, Petitioner must make a substantial showing of the denial of a constitutional right, or that reasonable jurists could debate, much less disagree, with this Court's resolution of

55

Petitioner's claims. *Arredondo v. Huibregtse*, 542 F.3d 1155, 1165 (7th Cir. 2008) (citing 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). The Court concludes that reasonable jurists could debate the Court's resolution of the judicial bias claim, but not of any other claim in this case.

Petitioner is advised that this is a final decision ending his case in this Court. If Petitioner wishes to appeal, he must file a notice of appeal with this Court within thirty days of the entry of judgment. *See* Fed. R. App. P. 4(a)(1). Petitioner need not bring a motion to reconsider this Court's ruling to preserve his appellate rights. However, if Petitioner wishes the Court to reconsider its judgment, he may file a motion under Federal Rule of Civil Procedure 59(e) or 60(b). Any Rule 59(e) motion must be filed within 28 days of the entry of this judgment. *See* Fed. R. Civ. P. 59(e). The time to file a motion pursuant to Rule 59(e) cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A timely Rule 59(e) motion suspends the deadline for filing an appeal until the Rule 59(e) motion is ruled upon. *See* Fed. R. App. P. 4(a)(4)(A)(iv). Any Rule 60(b) motion must be filed within a reasonable time and, if seeking relief under Rule 60(b)(1), (2), or (3), must be filed no more than one year after entry of the judgment or order. *See* Fed. R. Civ. P. 60(c)(1). The time to file a Rule 60(b) motion cannot be extended. *See* Fed. R. Civ. P. 6(b)(2). A Rule 60(b) motion suspends the deadline for filing an appeal until the Rule 60(b) motion is ruled upon only if the motion is filed within 28 days of the entry of judgment. *See* Fed. R. App. P. 4(a)(4)(A)(vi).

## IV.    Conclusion

The habeas corpus petition (Dkt. 1.) is denied on the merits. Any pending motions are denied as moot. The Court grants a certificate of appealability as to Claim B, the judicial bias

claim, as reasonable jurists could debate the Court's resolution of that claim. The Court declines to issue a certificate of appealability as to all other claims. The Clerk is instructed to enter a judgment in favor of Respondent and against Petitioner. Civil Case Terminated.

ENTERED:

Dated: October 29, 2019

ROBERT W. GETTLEMAN
United States District Judge